Joseph J. Wielebinski, Esq.
Texas Bar No. 21432400
Davor Rukavina, Esq.
Texas Bar No. 24030781
Jonathan L. Howell, Esq.
Texas Bar No. 24053668
MUNSCH HARDT KOPF & HARR, P.C.
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| In re: | § | |
|---|---|---|
| TEXAS GRAND PRAIRIE HOTEL REALTY, LLC, | § § § § § | Case No. 10-43242-dml (Chapter 11) |
| Debtor | § | |
| In re: | § | |
| TEXAS AUSTIN HOTEL REALTY, LLC, | § § § § | Case No. 10-43243-rfn (Chapter 11) |
| Debtor | § | |
| In re: | § | |
| TEXAS SAN ANTONIO HOTEL REALTY, LLC, | § § § § § | Case No. 10-43245-dml (Chapter 11) |
| Debtor | § | |
| In re: | § | |
| TEXAS HOUSTON HOTEL REALTY, LLC, | § § § § § | Case No. 10-43244-rfn (Chapter 11) |
| Debtor | § | |

**DEBTORS' EMERGENCY MOTION FOR
INTERIM AND FINAL AUTHORITY TO USE CASH COLLATERAL**

TO THE HONORABLE D. MICHAEL LYNN, U.S. BANKRUPTCY JUDGE:

COME NOW Texas Grand Prairie Hotel Realty, LLC, Texas Austin Hotel Realty, LLC, Texas San Antonio Hotel Realty, LLC, and Texas Houston Hotel Realty, LLC (collectively, the "Debtors"), the debtors-in-possession in the above styled and numbered bankruptcy cases (the "Bankruptcy Cases"), and file this their *Emergency Motion for Interim and Final Authority to Use Cash Collateral* (the "Motion"), respectfully stating as follows:

## I. PROCEDURAL BACKGROUND

1. On May 13, 2010 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"), thereby initiating their Bankruptcy Cases and creating their respective bankruptcy estates (the "Estates"). The Debtors have requested the joint administration of their Bankruptcy Cases for procedural purposes only.

2. The Debtors continue to operate their businesses and to manage the Estates as debtors-in-possession. No committee, trustee, or examiner has been appointed.

3. The Court has jurisdiction over the Bankruptcy Cases and this Motion under 28 U.S.C. § 1334. Such jurisdiction is core under 28 U.S.C. 157(b)(2). Venue of the Bankruptcy Cases before this Court is appropriate under 28 U.S.C. §§ 1408 and 1409.

## II. FACTUAL BACKGROUND

4. Each of the four Debtors owns and operates a Hyatt Place branded hotel in Grand Prairie, Austin, San Antonio, and Houston, Texas (the "Hotels"), with approximately 513 rooms in total, all remodeled in 2007. The Debtors own the real property and improvements, as well as the franchise rights to the Hotels, while various other asset and management services are contracted to outside, non-debtor companies. The Hotels are full service properties and, in

addition to rents derived from the renting of rooms, the Debtors generate substantial income from such other activities and services as food and beverage sales, meeting and banquet halls, telephone, and audio-visual services. Although the Debtors' Hotels have operated successfully, with the Debtors generally current on their various obligations, the deep recession, the relative youth of the Debtors' chosen brand, and a downturn in the overall hotel industry have affected the Debtors' recent financial performance.

5. In addition, the Debtors' primary secured obligations have matured, and the Debtors' lender has refused to extend the term of the Debtors' obligations or otherwise restructure the Debtors' secured obligations. Said lender has initiated state court proceedings against the Debtors and has threatened to seek the appointment of a receiver for the Debtors, as well as to seize the Debtors' operating cash, which would have devastated the Debtors' businesses, potentially led to the closing of the Hotels, and jeopardized the recoveries for all other creditors. This, combined with a present inability to refinance their obligations in light of market conditions, forced the Debtors to seek bankruptcy protection in order to restructure their debts, reorganize their businesses, preserve going concerns, and maximize the returns for all creditors.

### III. RELIEF REQUESTED

6. By this Motion, the Debtors request: (i) first, authority to use Cash Collateral (as defined below) on an emergency, interim basis, for the period from the Petition Date to approximately June 11, 2010, or such other date that the Court holds the Final Hearing (defined below) (the "Interim Period"), in the amounts listed, and for the purposes disclosed, on the interim budget (the "Interim Budget") attached hereto as Exhibit "A" and incorporated herein; and (ii) second, authority to use Cash Collateral for an additional six (6) month period (the "Final

Period"), in the amounts listed, and for the purposes disclosed, on the final budget (the "Final Budget") attached hereto as Exhibit "B" and incorporated herein, subject to any further extension thereof by agreement or by future order of the Court.

## IV. DISCUSSION

**A.   THE CASH COLLATERAL**

7.   The Debtors have cash and accounts on hand as of the Petition Date, and will generate postpetition rental revenue, all of which could constitute "Cash Collateral" as that term is defined by section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), although the Debtors and their counsel have yet to complete their review of whether any creditor holds perfected interests in any asset that may constitute Cash Collateral. While the Debtors reserve all of their rights with respect thereto, they recognize that the preferred course is to seek the Court's authority for the use of Cash Collateral pending any potential determination as to the perfection and validity of any alleged interest therein.

8.   Specifically, the Debtors are aware that Wells Fargo Bank, N. A., as trustee for the Morgan Stanley Capital I Inc. Commercial Mortgage Pass-through Certificates Trust, Series 2007-XLF9 ("Wells Fargo"), claims an interest in various types of property that would constitute Cash Collateral. While the Debtors reserve all of their rights to contest the following, including the validity, extent, priority, or avoidance of the same, at least pending their final review of all such documents and applicable law, the Debtors believe that Wells Fargo may claim interests in Cash Collateral pursuant to the following:

(i)   that certain *Promissory Note* (the "Note") dated April 9, 2007, and executed by each of the Debtors in favor of Morgan Stanley Mortgage Capital, Inc., in the original principal amount of $49,000,000;

(ii) those certain *Deed of Trust, Security Agreement, Assignment of Rents, and Fixture Filing* (the "Deeds of Trust") dated April 9, 2007 and allegedly properly recorded against each of the Hotels, securing the Debtors' obligations under the Note; and

(iii) various documents purporting to assign and transfer rights under the Note and Deeds of Trust to Wells Fargo.

9. The Debtors are also aware that Wells Fargo may claim interests in Cash Collateral pursuant to a *Rent Account Agreement* executed by each Debtor on or about April 9, 2007, pursuant to which Wells Fargo would have had rights to the Debtors' accounts under UCC account control agreements. However, for various reasons, that agreement was not complied with through, as the Debtors will demonstrate, no fault of their own. Regardless of any compliance or lack of compliance therewith, and any alleged fault of the Debtors, there does not appear to be an effective account control agreement in place, meaning that Wells Fargo does not have an interest in Cash Collateral pursuant to any such UCC agreement.

10. Finally, on May 7, 2010, the 352d Judicial District Court for Tarrant County, Texas, issued that certain *Temporary Restraining Order* against the Debtors which, among other things, restrained the Debtors' usage of their available cash as provided therein. The Debtors do not believe that said order confers any "interest" to Cash Collateral within the meaning of the Bankruptcy Code. Nevertheless, to the extent that Wells Fargo may claim that it does, the Debtors note that said order was entered within the statutory preference period and, any interest allegedly conferred thereby, would be avoidable under section 547(b) of the Bankruptcy Code.

11. The Debtors stress that they are filing this Motion in order to comply with the Bankruptcy Code and to ensure proper respect for their duties and this Court. However, they also stress that they are not by this Motion admitting the validity, extent, priority, or

unavoidability of any claim, lien, security interest, or other interest of Wells Fargo or any other entity, and they reserve all their rights with respect thereto, as well as with respect to any potential claim, defense, counterclaim, or other right they may have with respect to the same. Subject to these reservations, the balance of this Motion assumes, but does not admit, that Wells Fargo holds interests in Cash Collateral within the meaning of the Bankruptcy Code.

**B.    NEED FOR CASH COLLATERAL**

12.    It goes without saying that the Debtors have an immediate, urgent, and ongoing need for the use of their present and future cash. Among other things, the Debtors have ongoing obligations to: (i) pay for employees; (ii) pay for purchases of food and beverage; (iii) pay for upkeep, maintenance, and cleaning of their Hotels; (iv) potentially pay management and franchise fees; (v) pay for utilities; (vi) pay for security related services; (vii) pay for taxes; (viii) pay for the costs of their reorganization efforts, including professional fees and US Trustee fees; and (ix) pay for all of the various goods and services necessary to operate and run the Hotels. Without paying for the same, the Debtors would not be able to keep the Hotels open, would be in violation of franchise agreements and numerous local laws and ordinances, and would not be able to reorganize.

13.    In short, without the use of their cash, the Debtors' businesses would be over, the Hotels closed, and the Bankruptcy Cases dead – to the permanent prejudice of the Debtors, the Estates, and all creditors and parties-in-interest, including primarily Wells Fargo, which would be left with properties subject to vandalism, theft, loss, decay, and a multitude of taxes and other obligations. This is especially so because, upon information and belief, the Debtors' franchisor may terminate the franchise agreements if Wells Fargo attempts to take over the operations of the Hotels, thereby stripping the Hotels of their valuable brand.

14. At the same time, the Debtors have carefully prepared the Interim Budget and the Final Budget to demonstrate that they can operate within fixed budgeted amounts, while still cash flowing and providing adequate protection. The Debtors request authority to use Cash Collateral for the purposes stated in the budgets, in the amounts budgeted, subject to a monthly maximum ten (10) percent variance in any given line item and an overall five (5) percent variance monthly variance in the aggregate, for purposes of potentially unforeseen and emergency expenditures.

### C. AUTHORITY TO USE CASH COLLATERAL

15. Pursuant to the Bankruptcy Code, the Debtors may not use Cash Collateral unless "each entity that has an interest in such cash collateral consents," or unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A)-(B) (2009). While the Debtors will seek to negotiate a Cash Collateral stipulation with Wells Fargo, given Wells Fargo's aggressive prepetition tactics and general refusal to work with the Debtors, the Debtors anticipate a need for an order of the Court authorizing the use of Cash Collateral without Wells Fargo's consent.

16. The Debtors recognize that, for the first fifteen (15) days after the Petition Date, the Court may authorize the use of Cash Collateral only on an interim basis, and only to "avoid immediate and irreparable harm to the estate." FED. R. BANKR. P. 4001(b)(2). For the reasons stated above, and as will be demonstrated by the evidence, a refusal to permit the Debtors to use Cash Collateral for said fifteen (15) days will lead to immediate and irreparable injury, since the Debtors cannot go fifteen days without paying vendors, employees, and a whole manner of other services and costs. In fact, it would lead to the closing of the Hotels, the end of the Debtors as viable businesses, and the ultimate death of the Bankruptcy Cases.

17. Therefore, the Court may and should authorize the Debtors to use Cash Collateral immediately, on an interim basis in accordance with the Interim Budget, pending a final hearing and a final order on this Motion.

## D. RENTS ARE PROPERTY OF THE ESTATE AND CASH COLLATERAL

18. The Deeds of Trust, if otherwise valid, contain assignment of rent provisions. It can be expected that Wells Fargo will argue that the Deeds of Trust therefore effectuated an outright assignment and transfer of the Debtors' rents to Wells Fargo, such that said rents would not be property of the Estates in the first instance. The Debtors recognize case law that may support such a proposition, at least pursuant to Texas law.

19. Importantly, the Debtors and their bankruptcy counsel have yet to complete their analysis of the one-hundred page plus Deeds of Trust, Texas law, and whether the Deeds of Trust effectuated an alleged absolute or collateral assignment of rents, at least under Texas law. That issue can and will be briefed in advance of any final hearing on this Motion. However, given the emergency nature of the Bankruptcy Cases, and of this Motion in particular, it cannot be reasonably expected to fully review, brief, and litigate this potentially critical issue.

20. Nevertheless, there are two aspects of this issue that the Debtors will immediately address. First, only a portion of the Debtors' income is derived from rents. Even if the Deeds of Trust validly assigned an interest in rents to Wells Fargo, all of the other streams of income the Hotels and Debtors generate would not be so assigned. Such other income may not even constitute Cash Collateral and may well be subject to the provisions of section 552 of the Bankruptcy Code.

21. Second, and more importantly, the Debtors submit that whatever alleged interest Wells Fargo may claim in rents from an ownership perspective under Texas law is void as

against the Bankruptcy Code and is superseded by the clear Congressional dictates concerning property of the Estates and Cash Collateral. Therefore, whether any assignment of rents is allegedly absolute or collateral is irrelevant, since the Bankruptcy Code trumps any such alleged interests.

22. The Bankruptcy Code defines, as property of the Estates, not only all legal and equitable interests of the Debtors in property of almost any kind, but also as the "rents" from "property of the estate." 11 U.S.C. § 541(a)(6). It cannot be denied that the Hotels are property of the Estates, and that "rents" generated by the Hotels are "rents" within the meaning of section 541(a)(6) of the Bankruptcy Code. Therefore, state law assignment of rents aside, the rents generated at the Hotels are property of the Estates under the clear and unambiguous provisions of section 541 of the Bankruptcy Code. And, pursuant to sections 363(b) and 363(c), the Debtors may use property of the Estates in accordance with the Bankruptcy Code. Whatever the rents are under state law, and whoever has interests in them, the Debtors are able to use the same as property of the Estates.

23. Indeed, this very conclusion was recently confirmed by the bankruptcy court in *In re Amaravathi Ltd. P'ship*, 416 B.R. 618 (Bankr. S.D. Tex. 2009). In that opinion concerning the rents from an apartment building in which the lender claimed an absolute assignment of rents, the court looked to the primacy of federal law noting that, while property ownership is normally adjudicated based on state law, "there is an exception if Congress modifies state law through legislation enacted under Congress's authority to establish 'uniform laws on the subject of Bankruptcies throughout the United States,'" and state property law must relent "if some federal interest requires a different result." *Id*. at 622 (*quoting Butner v. United States*, 440 U.S. 48, 55, 99 S. Ct. 914, 918, 59 L.Ed.2d 136 (1979)). The court analyzed section 541(a)(6) of the

Code and concluded that postpetition rents were "rents" within the meaning of the statute. Added to this statutory application, the court noted multiple fundamental bankruptcy policies and goals supporting its construction, including that, by removing rents from property of the estate, the estate would have no source of income and therefore no possibility to rehabilitate, while still being obligated to pay the operating expenses of the apartment buildings for the creditor.

24. The same conclusion should apply with respect to the rents derived from the Hotels: pursuant to section 561(a)(6), those rents are property of the Estate regardless of any alleged absolute assignment of rents in the Deeds of Trust, and the Debtors may use the same pursuant to section 363 of the Bankruptcy Code.

25. In fact, the *Amaravathi* court's admonition concerning fundamental bankruptcy policy should not be taken lightly. There is a very strong federal policy in favor of permitting companies to seek reorganization under Chapter 11. *Ipso facto* clauses, and contractual prohibitions on filing, are void. A state court cannot enjoin a bankruptcy filing. Collateral may be used postpetition. The doors to bankruptcy must stay open regardless of contractual rights and agreements – otherwise, there is no bankruptcy. If a lender can have absolutely "assigned" to it a debtor's very source of income, and that income not be property of its estate, it is only a matter of time before every lender includes absolute assignments of every kind in every loan document, effectively killing any opportunity to file bankruptcy since the debtor will find not itself as the owner of property, but rather its lender. Such a result would not only violate fundamental congressional policy, it would turn it on its head. Whatever state law rights may be, they must fall in light of congressional dictate. After all, most every debtor that seeks bankruptcy protection has already breached a whole host of contractual obligations.

26. There is an additional reason why the Debtors may use the rents from the Hotels under the Bankruptcy Code even if there is an absolute assignment of rents. Namely, section 363(a) of the Bankruptcy Code specifically defines "cash collateral" as:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, **rents**, or profits of property and the fees, charges, accounts or other **payments for the use or occupancy of rooms and other public facilities in hotels**, motels, or other lodging properties.

11 U.S.C. § 363(a) (emphasis added).

27. In other words, the Bankruptcy Code specifically includes rents, and rents at hotels at that, as Cash Collateral. And, the Bankruptcy Code specifically permits the Debtors to use Cash Collateral. Perhaps, *arguendo*, the rents are not property of the Estates under section 541(a)(6) of the Bankruptcy Code, and perhaps they belong to Wells Fargo under Texas law. But it could not be clearer that they are also Cash Collateral, and that the Debtors can use Cash Collateral. Therefore, even if Wells Fargo ultimately succeeds on any argument that the rents at the Hotels are Wells Fargo's property, Congress has clearly stated that the Debtors may use such rents regardless.

28. For all of the above reasons, the Debtors may use the present proceeds of rents, and any postpetition rents, as Cash Collateral pursuant to section 363(c) of the Bankruptcy Code notwithstanding the Deeds of Trust's assignment of rents provisions, and the Court can and should authorize the same.

E. **ADEQUATE PROTECTION**

29. The Debtors acknowledge that, in order to use Cash Collateral, they must provide adequate protection to Wells Fargo. *See* 11 U.S.C. § 363(e). Whatever the forms of adequate protection may be under section 361 of the Bankruptcy Code, one conclusion is clear: if a lender

does not suffer a diminution in the value of its cash collateral as a result of the Debtors' usage thereof, then the lender is adequately protected.

30. Here, the evidence will demonstrate that the Debtors were current on their obligations prior to the Petition Date, and that they will cash flow positive postpetition. Therefore, not only will Wells Fargo not suffer a diminution in the value of any Cash Collateral interest, that value will increase postpetition. This is the hallmark of adequate protection and is alone sufficient under the facts of these Bankruptcy Cases.

31. Moreover, the Debtors are prepared to submit themselves to the Interim Budget and Final Budget, and to agree to replacement liens in postpetition assets, as well as a superpriority claim under section 507(b) of the Bankruptcy Code, all to the extent of any actual diminution in the value of Cash Collateral as a result of the Debtors' usage thereof, as further adequate protection, subject only to a reasonable carveout for postpetition professional fees.

32. Finally, it must be remembered what the Debtors' usage of Cash Collateral will be for – to preserve and enhance the value of Wells Fargo's collateral. Without Cash Collateral, the Hotels will close and generate no income, collateral will not be repaired and maintained, franchise rights may be lost, and taxes and other expenses will erode the value of Wells Fargo's collateral. The use of cash to preserve and enhance the value of collateral, while benefiting the Estates in general, is exactly the type of permitted Cash Collateral usage and adequate protection envisioned by the Bankruptcy Code.

33. For these reasons and protections, *i.e.* enhancing the value of Cash Collateral, preserving all collateral, detailed budgeting, replacement liens, and a superpriority administrative claim as described above, the Debtors submit that Wells Fargo and any other potential Cash

Collateral creditor is more than adequately protected for the Debtors' requested usage of Cash Collateral.

## V. PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court enter an order: (i) authorizing the Debtors to use Cash Collateral during the Interim Period as discussed above; (ii) scheduling a final hearing on the Motion; (iii) authorizing the Debtors to use Cash Collateral during the Final Period as discussed above, subject to potential future additional requests and extensions; (iv) finding any creditor with an interest in Cash Collateral to be adequately protected under the protections discussed above; and (v) granting the Debtors such other and further relief to which they may show themselves to be justly entitled.

RESPECTFULLY SUBMITTED this 13th day of May, 2010.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
Joseph J. Wielebinski, Esq.
Texas Bar No. 21432400
Davor Rukavina, Esq.
Texas Bar No. 24030781
Jonathan L. Howell, Esq.
Texas Bar No. 24053668
3800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201-6659
Telephone: (214) 855-7500
Facsimile: (214) 855-7584

**PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION**

## CERTIFICATE OF SERVICE

An omnibus Certificate of Service concerning all "first day" motions shall be separately filed by the undersigned, which shall reflect service of this Motion.

By: /s/ Davor Rukavina
Davor Rukavina, Esq.

**EXHIBIT "A"**

## Hyatt Place - Consolidated
### Statement of Income
1 Month Projection

|  | First 30 Days |
|---|---:|
| Room Revenue | 1,008,138 |
| Food Revenue | 48,800 |
| Beverage Revenue | 10,732 |
| Conference Svcs Revenue | 0 |
| Telephone Revenue | 1,838 |
| Miscellaneous Revenue | 16,332 |
| **Total Revenue** | **1,085,840** |
| | |
| Room Expense | 266,528 |
| Food Expense | 18,887 |
| Beverage Expense | 3,066 |
| Telephone Expense | 6,437 |
| Miscellaneous Expense | 10,099 |
| **Departmental Expense** | **305,016** |
| | |
| Administrative and General | 105,080 |
| Sales and Marketing | 86,796 |
| Energy | 55,377 |
| Repairs and Maintenance | 57,465 |
| Franchise Fees | 66,028 |
| **Undistributed Expense** | **370,746** |
| | |
| Gross Operating Profit | 410,078 |
| | |
| Management Fees | 27,146 |
| | |
| Income before Fixed Expense | 382,932 |
| | |
| Insurance** | 11,957 |
| Taxes*** | 77,986 |
| Re-Organization/Professional Fees | 95,000 |
| Contingency | 32,575 |
| FF&E | 54,292 |
| Asset Mgt Fee | 8,144 |
| **Total Fixed Charges** | **279,954** |
| | |
| **Net Cash Flow Before Debt Service** | **102,978** |

# EXHIBIT "B"

# Hyatt Place - Consolidated
## Statement of Income
6 Month Projection

| | First 30 Days | Next 30 Days | Third 30 Days | Fourth 30 Days | Fifth 30 Days | Sixth 30 Days | Total | |
|---|---|---|---|---|---|---|---|---|
| Room Revenue | 1,008,138 | 1,084,682 | 1,168,208 | 983,968 | 906,226 | 1,068,466 | 6,219,688 | 93.1% |
| Food Revenue | 48,800 | 50,136 | 49,134 | 48,506 | 43,152 | 47,853 | 287,580 | 4.3% |
| Beverage Revenue | 10,732 | 9,981 | 9,709 | 11,133 | 9,941 | 11,427 | 62,923 | 0.9% |
| Conference Svcs Revenue | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0.0% |
| Telephone Revenue | 1,838 | 1,946 | 2,146 | 1,858 | 1,668 | 1,905 | 11,361 | 0.2% |
| Miscellaneous Revenue | 16,332 | 17,256 | 18,607 | 16,384 | 14,855 | 16,908 | 100,342 | 1.5% |
| Total Revenue | 1,085,840 | 1,164,000 | 1,247,805 | 1,061,849 | 975,841 | 1,146,560 | 6,681,894 | 100% |
| Room Expense | 266,528 | 273,020 | 295,238 | 261,479 | 247,782 | 267,733 | 1,611,780 | 25.9% |
| Food Expense | 18,887 | 19,147 | 19,567 | 18,977 | 16,595 | 18,519 | 111,690 | 38.8% |
| Beverage Expense | 3,066 | 2,987 | 2,564 | 3,190 | 2,758 | 3,277 | 17,842 | 28.4% |
| Telephone Expense | 6,437 | 6,480 | 6,542 | 6,665 | 6,393 | 6,461 | 38,976 | 343.1% |
| Miscellaneous Expense | 10,099 | 10,785 | 11,906 | 10,258 | 9,090 | 10,698 | 62,836 | 62.6% |
| Departmental Expense | 305,016 | 312,419 | 335,816 | 300,568 | 282,618 | 306,687 | 1,843,125 | 27.6% |
| Administrative and General | 105,080 | 112,185 | 111,803 | 104,169 | 101,455 | 106,462 | 641,153 | 9.6% |
| Sales and Marketing | 86,796 | 82,802 | 81,983 | 78,570 | 81,681 | 83,538 | 495,370 | 7.4% |
| Energy | 55,377 | 57,869 | 63,911 | 63,713 | 55,657 | 54,030 | 350,556 | 5.2% |
| Repairs and Maintenance | 57,465 | 59,396 | 59,257 | 57,318 | 60,750 | 61,952 | 356,138 | 5.3% |
| Franchise Fees | 66,028 | 70,504 | 75,934 | 63,958 | 58,905 | 69,450 | 404,779 | 6.1% |
| Undistributed Expense | 370,746 | 382,757 | 392,887 | 367,728 | 358,447 | 375,432 | 2,247,996 | 33.6% |
| Gross Operating Profit | 410,078 | 468,825 | 519,101 | 393,553 | 334,776 | 464,441 | 2,590,773 | 38.8% |
| Management Fees | 27,146 | 29,100 | 31,195 | 26,546 | 24,396 | 28,664 | 167,047 | 2.5% |
| Income before Fixed Expense | 382,932 | 439,725 | 487,906 | 367,007 | 310,380 | 435,777 | 2,423,726 | 36.3% |
| Insurance** | 11,957 | 11,957 | 11,955 | 11,927 | 11,926 | 11,928 | 71,650 | 1.1% |
| Taxes*** | 77,986 | 77,986 | 77,986 | 77,986 | 77,986 | 77,986 | 467,916 | 7.0% |
| Re-Organization/Professional Fees | 95,000 | 65,000 | 65,000 | 65,000 | 65,000 | 65,000 | 420,000 | 6.3% |
| Contingency | 32,575 | 34,920 | 37,434 | 31,855 | 29,275 | 34,397 | 200,457 | 3.0% |
| FF&E | 54,292 | 58,200 | 62,390 | 53,092 | 48,792 | 57,328 | 334,095 | 5.0% |
| Asset Mgt Fee | 8,144 | 8,730 | 9,359 | 7,964 | 7,319 | 8,599 | 50,114 | 0.8% |
| Total Fixed Charges | 279,954 | 256,793 | 264,124 | 247,825 | 240,298 | 255,238 | 1,544,232 | 23.1% |
| Net Cash Flow Before Debt Service | 102,978 | 182,932 | 223,782 | 119,182 | 70,082 | 180,539 | 879,494 | 13.2% |